IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**TIMOTHY JANTZ**,

    Plaintiff,

v.

**SIG SAUER, INC**.

    Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff Timothy Jantz, through his attorneys, BACHUS & SCHANKER, for his complaint against Defendant Sig Sauer, Inc., does state and aver as follows:

### NATURE OF THE ACTION

1. This action seeks to recover damages for injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct of Defendant in connection with the design, development, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the Sig Sauer P320 handgun.

### PARTIES

2. Plaintiff Timothy Jantz is a resident and domiciliary of the State of Colorado, residing at 90 Beach Ave, PO Box 153, Maybell CO 81640 in Moffat County, Colorado.

3. Defendant Sig Sauer, Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801 and with a registered agent of Cogency Global Inc., 63 Pleasant Street, Concord, New Hampshire 03301

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28. U.S.C. § 1332 (diversity jurisdiction). The amount in controversy exceeds $75,000.00 exclusive of interest and costs. There is complete diversity of citizenship between Plaintiff and Defendant. Plaintiff is a resident of the State of Colorado. Defendant is a business entity organized in a state other than the State of Colorado, and Defendant's principal place of business is in a state other than the State of Colorado.

5. This Court has personal jurisdiction over Defendant, which is licensed to conduct and/or is systematically and continuously conducting business in the State of Colorado, including, but not limited to, the marketing, advertising, selling, and distributing of the Sig Sauer P320 handgun in the State of Colorado.

6. Venue is proper in this District pursuant to 28. U.S.C. § 1391(a), because Defendant marketed, advertised, and distributed the dangerous product in this District; Plaintiff resides in this District; Plaintiff's harms, losses, and damages occurred in this District; Defendant does substantial business in the State of Colorado and within this District; and at all times relevant hereto, Defendant developed, manufactured, promoted, marketed, distributed, warranted, and sold the Sig Sauer P320 handgun in interstate commerce.

## GENERAL ALLEGATIONS

7. Sig Sauer, Inc. was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. (hereinafter, "Sig Sauer") in October 2007.

8. Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

9. At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, all of whom acted within the course and scope of their employment, service and agency.

10. Among the firearms designed and manufactured by Sig Sauer is the Sig Sauer P320 (hereinafter, "P320"), a striker-fired pistol.

11. The P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

12. The P320 has fired without the trigger being pulled or deliberately actuated by the user, on numerous civilians and law enforcement agents across the nation.

13. There have been over 100 incidents (and likely multiples more) of the P320 unintentionally discharging when the user believed they did not pull the trigger, many of which have caused severe injury to the users and/or bystanders.

14. The vast majority of these users are law enforcement officers, former military personnel, and/or trained and certified gun owners.

15. This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Sig Sauer's, negligence, defective design, and unfair and deceptive marketing practices regarding a firearm.

16. Prior to the incidents detailed below in this Complaint, Sig Sauer received multiple complaints and notifications of P320s firing when the trigger was either not pulled, or not deliberately actuated by the user.

17. In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:

> **SAFETY WITHOUT COMPROMISE**
>
> We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

18. Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many times.

19. Defendant, Sig Sauer, had knowledge long before the sale of the P320 used by the Plaintiff in the instant matter, that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker, a hinged trigger, and/or a grip safety.

20. In the years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

21. Years before the incident involving Plaintiff occurred on August 31, 2022, Sig Sauer expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



22. In additional marketing material, under the heading "Striker Safety," Sig Sauer further states: the striker safety "[p]revents the striker from being released unless the trigger is pulled."

23. At the same time, Sig Sauer contradictorily stated in the original owner's manual for the P320, which warns on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

24. It is standard operating procedure for many U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, as well as customary for many private owners, to carry pistols with a chambered round.

25. Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

26. The "+ 1" represents a chambered round.

27. Sig Sauer was aware of the latter fact at the time it designed and manufactured all of its pistols, including the P320. The P320 is the first striker-fired pistol it has ever manufactured.

28. A striker-fired pistol is different from the traditional "hammer-fired" pistol. It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear. In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.



29. Of the nearly 20 models of non-military P320s, only 1 model offers a manual external safety as an "option."

30. Sig Sauer's custom-design program allows for hundreds of thousands of different configurations of the P320, but does not allow users to add any type of external safety.

31. An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.

32. A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

33. Upon information and belief, nearly every striker-fired pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

34. Upon information and belief, Sig Sauer manufactures one of the only striker-fired pistols on the market that are not equipped with any form of external manual safety.

35. Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 that fell to the ground from less than three feet, Sig Sauer removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices. **Careless and improper handling of any firearm can result in unintentional discharge.**

36. Defendant, Sig Sauer had never before represented that mere "vibration" could cause the weapon to discharge.

37. Upon information and belief, no other firearms manufacturer has ever made such a representation.

38. Sig Sauer acknowledges in its own manuals that vibrations can cause its safety mechanisms to fail to work as designed.

39. Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



40. Despite their representations, Sig Sauer never made a tabbed trigger safety available as an option for the P320.

41. In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended use and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

42. When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer knew or should have known that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and that un-commanded discharges could occur in the ordinary course of using the weapon.

43. Before Plaintiff's employer purchased their pistols, Sig Sauer was aware of other, prior un-commanded discharges of the P320 platform, and other Sig Sauer pistols, many of which pre-dated their purchases.

44. In 2015, a Pennsylvania state trooper and firearms instructor killed another trooper with his Sig Sauer pistol when it discharged without a trigger pull while conducting safety training.

45. In 2016, a tactical response training instructor near Sacramento dropped his Sig Sauer, firing a bullet into a student's truck.

46. In the period between 2012 and 2015, the New York City Police Department reported 10 un-commanded discharges involving Sig Sauer weapons.

47. In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan police officer's vehicle when the officer moved to exit the vehicle during a snowstorm. The incident was captured on the officer's body-worn camera.

48. In 2016, the Surprise, Arizona Police Department complained to Sig Sauer of two separate incidents of P320s firing without trigger pulls.

49. In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

50. In November 2016, a P320 fired un-commanded on a police officer in Holmes Beach Florida, striking him in his leg.

51. Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

52. In 2017, in Michigan, a sheriff's deputy's P320 discharged without a trigger pull, striking a schoolteacher in the neck.

53. On January 5, 2017, a P320 shot a Stamford, Connecticut SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

54. On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department.

55. On June 14, 2017, a P320 discharged without a trigger pull in Wilsonville, Oregon.

56. On June 20, 2017, a P320 discharged without a trigger pull while in use by the Howell Township, New Jersey Police Department.

57. In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leader, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.

58. On July 28, 2017, a P320 discharged without a trigger pull in Tarrant County, Texas.

59. On August 4, 2017, the Stamford SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

60. Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

61. This statement was false, in view of Sig Sauer's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

62. On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard[s] for safety."

63. This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

64. No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

65. Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnect switch, and an improved sear to prevent un-commanded discharges.

66. On August 9, 2017, the police chief of Morrow, Georgia issued an emergency order removing the P320 from service.

67. In October 2017, a P320 discharged without a trigger pull in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

68. On November 12, 2017, a P320 discharged without a trigger pull in Dallas County, Texas.

69. On February 2, 2018, Tyler Herman of McCloud, Oklahoma was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 discharged, striking Herman and causing catastrophic injuries.

70. On February 7, 2018, Loudoun County, Virginia Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three surgeries requiring general anesthesia, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

71. Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

72. In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

73. In June 2018, a Williams County, Ohio police officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver's side door.

74. In May 2018, a Rancho Cucamonga, California police officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

75. In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

76. In October 2018, retired law enforcement officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

77. In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused severe tunneling wounds to this right leg.

78. On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square. The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject.

79. On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts Police Department hitting him in his leg and causing substantial injuries.

80. In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

81. The Philadelphia Transit Authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

    > This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through two investigative services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

82. On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

83. On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

84. On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

85. On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

86. The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

87. On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts Police Department, as he was in the process of putting his duty belt on.

88. On February 27, 2020, Tampa Police Department Reserve Office Howard Northrop was severely and permanently injured when his service-issued P320 discharged without a trigger pull, while inside his service-issued holster.

89. Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

90. On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski, of Immigration and Customs Enforcement, during a training exercise in New Castle, Delaware. Slatowski's P320 fired while in its holster, and the casing did not eject.

91. On January 23, 2021, civilian Timothy Davis was severely injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

92. On June 2, 2021, Troy, New York Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

93. On February 7, 2022, Honesdale, Pennsylvania Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

94. Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

95. Following this incident, the Honesdale, Pennsylvania Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

96. On March 28, 2022, Houston, Texas Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

97. Sergeant Reyes's incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were not near his holster at the time the P320 discharged.

98. On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

99. Following this incident, the third in as many years involving a Milwaukee police officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

100. In response to the incidents of Milwaukee police officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022, that the Milwaukee Police Department would replace every single P320 in its arsenal with one of Sig Sauer's competitor pistols.

101. Between 2015-2022, there have been at least nine incidents where an Oklahoma Highway Patrol officer had a P320 discharge when the officer did not pull the trigger.

102. Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed within the agency once it switched its primary weapon from a Glock to the P320.

103. Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

104. To date, Sig Sauer has never issued a mandatory recall of the P320 for repairs; though it has done so in the past for other of its products with far lesser sales.

105. In an interview in 2013, Sig Sauer's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that Sig Sauer's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that Sig Sauer's growth has outpaced the firearms' industry's growth by "two or three times."

106. When asked what some of his biggest professional challenges he has faced in his career, he stated:

    > At Sig Sauer, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

## PLAINTIFF'S INCIDENT

107. Plaintiff incorporates all previous allegations as though fully set forth herein.

108. At all times relevant to this action, Plaintiff was employed as a Lieutenant for the Moffat County Sheriff's Department.

109. Prior to August 31, 2022, Plaintiff had over 40 years of experience as a law enforcement officer.

110. Prior to August 31, 2022, Plaintiff underwent extensive law enforcement training and education, including specialized firearm training and firearm instructor training, and obtained numerous certifications as a law enforcement officer, including but not limited to the following:

    a. Certification from the State of Colorado Board on Peace Officer Standards and Training, completed on October 1, 1982;

b. Certificate for completion of the "Use of Deadly Force" training course from the Office of the District Attorney of the 14th Judicial District (Colorado), completed on May 26, 1983;

c. Certificate for completion of the "Combined Outlaw Biker Research and Attack Team" (COBRA) training course on "Biker Gang Investigation, Intelligence, and Field Survival Procedures", completed on June 10, 1983;

d. Certificate for completion of the National Rifle Association (NRA) Certified Police Marksman program, completed on November 4, 1990;

e. Certificate for completion of the Federal Bureau of Investigation (FBI) Training School course "FBI Basic SWAT School", which Plaintiff completed from April 17, 1998 through May 1, 1998;

f. Certification from the National Rifle Association (NRA) for completion of the "Police Firearms Instructor Development" program, sponsored by American Firearms Training and Tactics, completed on October 2, 1998;

g. Certification from the National Rifle Association (NRA) recognizing and certifying Plaintiff as a certified Firearms Instructor, completed on October 13, 1998;

h. Certified as an "Operations Level First Responder" on March 22, 1999;

i. Certificate of completion of the Police Accountability Conferencing program, completed from November 8, 1999 through November 9, 1999;

j. Certificate of completion of the County Sheriffs of Colorado "First Line Supervisory Course" training program (40 hour training program), completed on May 19, 2000;

k. Certification from the Colorado Association of Chiefs of Police for completion of the "Managing the Firearms Training Program", which Plaintiff completed on September 26 and 27 of 2002;

l. Certificate for completion of the "Firearms Instructor Training" program, through the Colorado Law Enforcement Firearms Instructors Association (CLEFIA), completed on June 25, 2004;

m. Certificate of completion for the Colorado Law Enforcement Training Project Supervisory Course (16 hour training program), completed from August 31, 2004 through September 1, 2004;

n. Certificate of completion of the County Sheriffs of Colorado "New Sheriff's Training Institute" training program (80 hour training program), completed from December 4, 2006 through December 15, 2006;

      o. Certification through the Moffat County Sheriff's Office for completion of the "TSA Flying While Armed" training program, which Plaintiff completed on February 3, 2010.

      p. Certificate of completion of the Laramie County Sheriff's Office's "Field Training Officer Seminar" (40 hour training program);

111. Prior to August 31, 2022, Plaintiff received numerous letters and certificates of commendation as a law enforcement officer, including but not limited to the following:

      a. Commendation and award from the Moffat County Sheriff's Office (Colorado) naming Plaintiff "Officer of the Year" for 1993;

      b. Correspondence and commendation from Congressman Scott McInnis of the Congress of the U.S. House of Representatives, in Washington, D.C., for Plaintiff being awarded "Officer of the Year" in 1993, received on June 6, 1994;

      c. Commendation from the Moffat County Sheriff's Office (Colorado) for Plaintiff's role in fighting a housefire by climbing on the roof and putting out the fire with a garden hose, resulting in injury to his hand, which was received on February 1, 1995;

      d. Commendation for Plaintiff's handling of a murder case from Sgt. R. Holford, received on December 23, 1997;

      e. Commendation from the Moffat County Sheriff's Office (Colorado) for Plaintiff's role in the search and rescue of 2 injured snowmobilers, received on February 4, 1998;

      f. Correspondence and commendation from the District Wildlife Manager and the Moffat County Sheriff's Office for Plaintiff's involvement in an animal poaching investigation involving 7 suspects with firearms, received on March 14, 1999;

      g. Commendation from the State of Colorado Department of Agriculture for Plaintiff's participation in the "Livestock Stops", received on October 23, 2000;

      h. Commendation from the Moffat County Sheriff's Office (Colorado) for Plaintiff's role in a search and rescue of 3 missing persons in Cross Mountain Canyon, received on May 12, 2001;

      i. Correspondence and commendation for Plaintiff's role in providing a law enforcement training course at Dinosaur National Monument, received on May 31, 2001;

      j. Correspondence and commendation from Congressman Scott McInnis, of the Congress of the U.S. House of Representatives, in Washington, D.C., awarding Plaintiff the "Advocates Officer of the Year" award on February 25, 2004

  k. Correspondence from the family of a deceased rafter Plaintiff assisted with the search, rescue and recovery thereof, received in May of 2005;

  l. Commendation from Verlaine L. Harris of the Colorado Department of Public Safety, received on September 19, 2005;

  m. Commendation from the U.S. Department of the Interior for Plaintiff's role in providing law enforcement training to the agency, received on June 1, 2006;

112. In addition to the extensive law enforcement training, certifications, awards and commendations referenced above, Plaintiff has undergone additional firearms training, instruction and practice, including but not limited to the following:

  a. In excess of 40 hours of firearms training in the Police Academy in 1982;

  b. In excess of 100 hours of firearm training and practice in 4 ½ years with the Craig Police Department (Colorado), with 12 hours per year of firearm qualification hours and in excess of 10 hours per year of firing range time;

  c. In excess of 40 hours of firearm training, practice and range time with the Elizabeth Police Department;

  d. In excess of 10 hours of firearm training, practice and range time with the Grand County Sheriff's Office;

  e. In excess of 384 hours of firearm training, practice and range time with the Moffat County Sheriff's Office over a career spanning over 32 years, with at least 12 hours per year of firearm qualification hours, at least 10 hours per year of range time, 40 hours of firearm training and instruction with the NRA Firearms School, 40 hours of firearm training and instruction with SWAT School, 24 hours of training with the Colorado Law Enforcement Firearms Instructor's Association (CLEFIA) in 2004, 16 hours of training with the Colorado Association of Chiefs of Police in "Managing the Firearms Training Program" in 2002, 8 hours of training with the Transportation Safety Administration (TSA) with a certification in "Flying While Armed";

  f. In excess of 328 hours of personal range time in more than 41 years in law enforcement, with an average of at least 8 hours per year;

113. Plaintiff has had such a distinguished law enforcement career that he was elected Sheriff of Moffat County, Colorado, in 2007.

114. Shortly prior to August 31, 2022, Plaintiff was issued a Sig Sauer P320 handgun by the Moffat County Sheriff's Office.

115. After receiving Plaintiff's department issued Sig Sauer P320 handgun, Plaintiff underwent an additional two (2) days of training directed specifically to the P320 handgun.

116. On August 31, 2022, Plaintiff was removing his service belt in his home.

117. On that date, the Plaintiff's P320 service weapon suddenly and unexpectedly discharged while still in the holster on his service belt.

118. Plaintiff never touched the trigger and did not intend to fire the weapon.

119. The bullet struck Plaintiff in the right knee, causing substantial injury, blood loss, and nerve damage, along with severe emotional trauma.

120. While the full extent of the physical damage to Plaintiff's leg is not yet known, he has had and it is likely that he will have trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

121. As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment.

122. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

## FIRST CLAIM FOR RELIEF
**(Negligence)**

123. Plaintiff incorporates all previous allegations as though fully set forth herein.

124. At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner, and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

125. At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

126. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.

127. Upon information and belief, at all times relevant hereto, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal complaints regarding the function of the P320 handgun, informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, video documentation of the P320 handgun firing without a trigger pull, and other sources of information to be developed in discovery.

128. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    a. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    b. By failing to use due care in designing the P320 by failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    c. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    d. By failing to issue a mandatory recall of the P320 as Sig Sauer (and other firearm manufacturers) had done in the past with other defective products;

    e. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    f. By negligently failing to unambiguously warn purchasers and end users of the P320, including Plaintiff, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    g. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, test, service and work on the gun;

    h. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

    i. By including a defective and improper holster in the original packaging with the gun;

    j. By misrepresenting the dangers and hazards posed by the gun;

    k. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

    l. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

    m. By failing to incorporate safeties which were standard among all of the P320s competitors;

    n. Other negligent acts and omissions to be developed in the course of discovery.

129. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the P320 would or could give rise to serious bodily injuries to such users, up to and including death.

130. The P320's defective condition was not visible and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

131. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the August 31, 2022, unintended discharge and Plaintiff's injuries resulting from the accident.

132. As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

## SECOND CLAIM FOR RELIEF
### (Strict Product Liability – Design and Manufacturing Defects)

133. Plaintiff incorporates all previous allegations as though fully set forth herein.

134. At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, distributed and sold the P320 handgun, as previously described, that was issued to and used by Plaintiff.

135. The P320 was expected to and did reach the usual consumers of such products, including Plaintiff, without substantial change in the condition in which it was produced, manufactured, sold, distributed and marketed by Defendant.

136. At all relevant times, the P320 was in an unsafe, defective, and inherently dangerous condition, which was dangerous to foreseeable users, including the Plaintiff.

137. The P320 designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was defective in design in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design of the product.

138. The P320 was further defective in design in that, when it left the hands of Defendant, it was unreasonably dangerous, and it was more dangerous and posed risk greater than an ordinary consumer would expect.

139. At all relevant times the P320 was in defective condition and unsafe, and Defendant knew or should have known that its product was defective and unsafe.

140. At the time of Plaintiff's use of the P320, it was being used for the purposes and manner normally anticipated and intended.

141. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, anticipated and intended use.

142. In creating the P320, Defendant created a product that was and is unreasonably dangerous for its normal, anticipated and intended use, and in disregard of the fact that a safer alternative design existed.

143. By reason of the foregoing, Defendant is strictly liable to Plaintiff for the sale of its defective product.

144. The defects in the P320 were a direct and proximate cause of Plaintiff's injuries as set forth above.

145. The defects in the P320 caused Plaintiff's injuries and damages as set forth above.

### THIRD CLAIM FOR RELIEF
**(Colorado Consumer Protection Act)**

146. Plaintiff incorporates all previous allegations as though fully set forth herein.

147. Pursuant to C.R.S. § 6-1-101, Defendant has a statutory duty to refrain from making false and/or fraudulent misrepresentations and/or from engaging in deceptive acts or practices in the sale and promotion of the P320 handgun.

148. Defendant engaged in unfair, deceptive, false, and/or fraudulent acts and or trade practices in violation of the Act, including but not limited to.

    a. Publishing advertising, instructions, and product material containing inaccurate and incomplete information regarding the P320;

    b. Misrepresenting the nature, quality, and characteristics of the P320;

    c. Misrepresenting the safety of the P320;

    d. Engaging in fraudulent and/or deceptive conduct that creates a likelihood of confusion or misunderstanding;

    e. Failing to disclose material information concerning the dangerous nature of the P320.

149. Defendant's conduct in connection with the P320 was impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendant falsely and/or deceptively misrepresented material facts regarding the utility, benefits, cost, safety and advantages of the P320

150. These deceptive practices occurred in the course of Defendant's business.

151. These deceptive practices significantly impacted Plaintiff and the public as actual or potential consumers of Defendant's product.

152. As a direct, foreseeable and proximate cause of Defendant's deceptive trade practices, Plaintiff suffered actual damages, including personal injuries, as set forth above.

153. As a result of the foregoing acts and omissions, Plaintiff is entitled to treble damages, attorneys fees, and costs.

Wherefore, Plaintiff Timothy Jantz demands judgment against Defendant Sig Sauer, Inc. in an amount to be determined at trial for his injuries and damages as set forth above, special damages, treble damages, costs, expert witness fees, attorneys fees, pre and post-judgment interests, and such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

    Respectfully submitted,

By: */s/ Steven W. Schabacker*
Steven W. Schabacker, Esq. #58984
*Attorney for Plaintiff*
Bachus & Schanker, L.L.C.
950 17th Street, Suite 1050
Denver, CO  80202

Date:   January 3, 2024